Good morning. If it pleases the court, my name is Gregory Bartolome. I represent Lionel Mendez. The old adage that the ends justifies the means seems to characterize the conduct of the police officers in this case. And the controverting facts established by defense counsel at the suppression hearing, we think, supports that characterization. We're here because we believe the district court, respectfully, erred by not recognizing the significance of those controverting facts when the motion to suppress was denied. Very briefly, the police reports were prepared and there was testimony to the effect that the officer stopped Mr. Mendez, and then while one officer took him aside, the other officer ran an I.D. license check and that he was checking the registration at the time and then returned to where Mr. Mendez was being held. And that's when the observations were made regarding tattoos pertaining to a gang called the Latin Kings. And then that developed from there to some questioning about gang involvement, prior prison term, and eventually questions where the defendant or appellant allegedly answered that there was a gun in the car. And that all happened within a period of eight minutes? Eight minutes, according to the testimony of the officers. Okay. You're not challenging the legitimacy of the initial stop based on driving the vehicle with expired tabs? No, we are not. All right. No, we are not. I guess the question I have for you, counsel, it seemed to me that the district court, in reviewing the testimony and the evidence, found that based upon your client's initial response, that the scope of the Terry stop expanded, because when they asked him for his driver's license, he presented not a driver's license, but a California identification card. So now we have another reason to make further inquiry, and that is, is this a licensed driver? And that it was at the point when he got out of the car, they asked him to get out of the car, and when they were frisking him for weapons is when they saw the Latin Kings tattoo for the first time. So what I'm really asking you is, doesn't our case law recognize, in conducting a Fourth Amendment reasonableness analysis, that as these sorts of things unfold, the officer might very well be diverted from the original purpose for the stop in order to follow up on other clues that a trained police officer recognizes may be indicia of suspicion of other crime? Judge, I understand what you're saying, except we think that the whole issue of the California ID is actually a red herring, because as you recall from the excerpt and from the testimony, that was the very first thing the officer checked. And that took all of two minutes to do. It was four minutes, but whatever it was, it was when the officer came back to say he had a California driver's license. A valid license, yes. Yes. When he came back to say that is when he, the officer says he heard Taylor, not Taylor, responding to a question, where are you from, by saying he's from the Kings and that he remarkably volunteered, yes, I'm from the Kings, by the way, instead of saying I'm from Los Angeles, Chicago. I'm from the Kings. I'm a gang member, and I got sent to jail. I've been sent to prison, in case you want to know something else that may create suspicion. Yes, Your Honor. He said that's what he heard. Now, so that's all within that time frame of determining that there was a valid California license. Yes, Judge. But we have trouble with that officer's version, because that's the same officer. That's a fact finding by the district court that that's what the officer said. You know, there may be lots of times where it's remarkable how people volunteer for searches and say, why don't you come in and look for cocaine. But when there's a finding of fact by a district court, it's very, very difficult. Judge, we think that the district court committed plain error on that point, because the officer you're referring to is the same officer that said when he first went to his vehicle, he checked the registration. And that was before Mr. Mendez was placed under arrest. Mr. Titterington, defense counsel, got the computer history records and showed that that was not the case. No, he didn't do it until about 26 or 30 minutes after. 9.48 p.m. And the arrest had taken place at 9.26. But you're asking on this arrest to find that the district court's findings of fact are clearly erroneous when he credited the officer's testimony. Yes, Your Honor. That's exactly what we're asking, because we don't see any basis. We had concrete facts. We had the officer's versions on one hand. We had the computer history on the other. And what the district court was being asked to do was take a look at them, look at what this officer's saying happened. But he may have concluded that the officer's memory was faulty on that point. Well, Judge — Not concluding that he lied in general. Well, one of the reasons for writing police reports in the first place is to have some sort of at least kind of an accurate reference point of what took place. Yet when you have their own computer controverting what's in the reports and controverting their oral testimony, then you've got a real problem. Well, you've got a credibility problem. But what you're asking us to do is to declare as a matter of law that there's only one version of the truth here, and that's what the computer shows. And the district court had all that evidence before it and drew the credibility determination differently than the way you wanted him to do it. But is that clearly erroneous under the — under our standard of review and overturning findings of fact? We think that it is because the district court never even recognized that that controversy existed. And in the order which the — But your whole theory, as I read your pleadings to the district court, your whole theory was that this stop should have been narrowly focused upon the driving violation, the licensing violation, that the vehicle was not properly registered and that it was impermissible for the officer in that eight-minute or four-minute time period to ask a question that was unrelated to licensing or driving. And as I understood the record, the question that you challenged was, where are you from? And that that was impermissible, even though by then they'd seen the gang tattoo, he's driving a car with Arizona plates but carrying a California driver — or not a driver's license but an identification card. I mean, don't we have to conclude that under Chavez Valenzuela, that that's an impermissible question exceeding the scope of the stop in order to give you the relief you want? I would agree with you, Your Honor, and add to that, that at the point in time where the officer already determined the license was valid, they should have made efforts to minimize the detention, but they didn't do that. The question — the problem, and we keep running into two different issues. One is, is the question improper, where are you from? One of — under one of your theories, it doesn't matter, because you say he didn't give the answer the officer says he gave. Leaving that aside, the clearly erroneous one, why is it improper for an officer to stop somebody without registration and finds out he gives — he doesn't have a driver's license and gives him an out-of-state card? Why is it improper for him to ask, in connection with determining whether he has a valid license and valid registration, where are you from? Why is that an improper question, assuming the credibility, that it was asked before the man came back with the information about the license? If it's done before the other officer returned with the information about the license, I don't necessarily see a problem with that, because even under Valenzuela, Chavez Valenzuela — The testimony is that it was before, because he testified when he came back, he was already on to telling him — he heard him saying, you know, I've been in prison. Yes, the officer says he heard that. So in your case, in order to attack the whether you're from, you have to set aside the district court's credibility finding. We believe that was an error, Judge, because of — How about the ultimate question that was asked? I'm sorry? The ultimate question that was asked. Do you have a gun or do you have a weapon in the car, whatever it was? At that point, they were really not entitled to continue to have detained him to have even gotten to that question. And I think that's the whole point. From an officer's safety standpoint? I mean, now they know at that point that he is a gang member from a violent Chicago gang. He's done time in prison for weapons violations. And this is at, what, 9, 30, 10 o'clock at night? I think we've jumped ahead one question, though, if we're going to do this in order. The question before that question is, why were you in prison? Assuming that at that point, the officer would come back and there was no reason to detain him any further. Is that a proper question, why were you in prison? I don't think it was, Judge. I don't think that there should have been any further questioning from the moment that they determined that his license was valid. And that segues into the issue of officer safety. They had already done a Terry Patdown. They had Mr. Mendez sitting on a curb. He no longer posed a danger to them. And the officers even testified that the reason for having him sit there was in order to address the officer safety issue. Well, they would have an interest, wouldn't they, in knowing whether there was a gun in the car? Well, Judge, at that point, then we're basically saying that they could continue to search for whatever else they wanted to search. It's a different question. Whether the officer would have been terminated, then, is a different question. The question of whether you could ask whether you have a gun in the car, if he were continuing the questioning, is something else. At the one – it depends on what point of the investigative detention we're at. If there's already been an issue satisfied with regards to the purpose for that question, then that would be improper, and I think it violates Chavez-Valenzuela. I had wanted to reserve some time, but it appears that I'm not. Thank you, Judge. Good morning. My name is Bill Solomon. I represent the United States of America in this case. Mr. Barthelemy did not write the briefs in this case, but I believe that the briefs actually misconstrued what's in the record. Appellant's argument is this. The officer stopped him because they didn't see a license plate on his vehicle. They took him out of the vehicle, immediately began to pursue other avenues of investigation, and never looked into the registration issue until after they found the gun in the car and after they had arrested him, when they ran the registration and VIN number after they ran the serial number on the firearm. The record tells a different story. The officer clearly testified in the record that after the stop was conducted, the first officer, Detective Jansen, asked Mr. Mendez to step out of the car, obtained his California identification from him. The other officer, Detective Brackey, was also near the car at that time, and he unequivocally testified on three separate occasions in the record that he saw the registration was expired on the face of the registration before he ever went back to the patrol car to run the records check. That's something that is blatantly missing from Appellant's briefs. Assume that's true. So what? So his argument is that the inns justified the means. They stopped Appellant for a registration violation, yet never investigated the registration violation, and therefore didn't have means to detain him after they learned the reason to investigate any further. They knew the registration was not valid. They didn't know whether he had a license or not. Okay. Well, they came back then and knew there was a license. Yes. There was a license. The only other thing they knew was that he was a gang member and that he had been in prison, assuming the veracity of the officer's statement. Correct. Okay. And they knew there was no reason to detain him any further. No. They knew his – they knew the registration was expired.  Well, what do you have to do then? Like, you just write him a ticket. You give him a ticket. Right. And he was – You give him a ticket. You've written the ticket right there. Here's your ticket. Get this corrected. It's a technical violation. You get it corrected and you're done. Right. And he was walking back to – walking back to Mr. Mendez's car to inform him that his registration was expired and presumably to write him a ticket, and that's when he overheard the conversation that Mr. Mendez was in prison. Yes. Mr. Mendez. What is the justification then for pursuing that to find out why he'd been in prison? Well, he – the sequence of events was that they stopped him for the registration violation. He saw the registration was expired on his face and then went back and conducted the record check. The testimony is that he was coming back to inform Mr. Mendez that the registration was expired, and at that point, the question, where are you from, had already been asked. Yes. I didn't say that. That had been asked. I said, we assume the truthfulness of that. And assuming that, then the question was asked, where are you from, which drew the remarkable, you know, answer, I'm from Chicago, I'm a gang member, and just in case you want to be suspicious, I've been in prison. Correct. I said, we assume all of that is true because we're very credible. So what justifies then pursuing an investigation after that point and saying why were you in prison? Well, the citation had not yet been issued. He had just – he was just coming back from the patrol car to inform Mr. Mendez that the registration was expired and that – There's no reason for any further investigation at that point. Well, but at that point, he had already heard the answer that he's – All right. Yes, that he was in prison. So why did he then say to him, why were you in prison, for what crime did you commit? He asked him that crime. I don't know why he did it. It's not in the record as to why he asked him that question. I don't like the answer. Well, but if it's part of an investigation. Correct. And there's no reason for it. It's beyond the scope. Well, he was suspicious. He had mentioned he was in a gang. He had mentioned he was in prison and simply asked him why he was in prison. I know it simply doesn't help, but he asked him why he was in prison. He did ask him why he was in prison. So he was continually – He was investigating now a new – as the Court said – A new crime. Yes. He was investigating a potential new – he had other objective particularized suspicious behavior or factors that he was now investigating, which is what Chavez Valenzuela, Perez, and that line of cases allow when officers do have additional objective particularized factors of suspicion. Then the question is whether if you stop a gang member and he tells you he's been in prison, that gives you reasonable suspicion that he's committed another crime. It will depend on the totality of the circumstances as to whether it does. Okay. So here – so that's a good point, because here he had already – they had already given him a pat-down search, right? They had, yes. He got out of the car. They said he got out of the car, gave him a pat – made him put his hands up and patted him down. They found no weapons. They sat him down on the curb. Yes. So why was it necessary – what was the totality of the circumstances that justified the further questioning about why were you in prison and do you have a gun in the car? Well, that came about first from asking him where are you from, and instead of saying I am from Chicago or I am from Los Angeles, I'm from the Latin Kings, which is a suspicious answer in itself. They followed up on that question – or he actually followed up and volunteered, not only am I from the Latin Kings, but I've spent time in prison. And I'm probably a good suspect for you. Probably so. And so investigating that further line of questioning based on that new reasonable suspicion – That's the issue, then, as you see it, whether saying – whether seeing someone with gang identification on them – let's assume he was walking down the street. You see a gang member, and he says to you, you know, I was in prison once. That gives you reasonable suspicion to pursue an investigation. That may be a different case, though, because here if they were to stop the gang member on the street and pat the gang member down on the street, they know he doesn't have weapons on him. So he doesn't have access to weapons. That was the reason for the question, why were you in prison, to see if he had weapons? Well, the officers testified, as Judge Tallman mentioned, there was an officer's safety concern here. Unlike the gang member on the street who, if you approach him and pat him down, he doesn't have weapons. Why did he ask them why he was in prison? If you say that it was not their investigating another offense, that they had reasonable suspicion to investigate. But now this is a different theory. Well, no, I don't say that they didn't have additional reason to investigate. He had volunteered that he had been in prison. Yes.  So they were following that additional line of questioning. I mean, isn't the question here, I'm looking at the language in Chavez-Valenzuela, we said in that case that the initial questioning has to be confined to reasonably related to the justification for the stop. Correct. But then we go on to say, I guess I'm looking at page 724 of 268F3rd, he may expand the scope only if he notices particularized objective factors arousing his suspicion. And what I understand the district court to have said was these facts, the admissions that he had made about being in prison, Latin kings and so on, did constitute under Chavez-Valenzuela the particularized objective factors that authorized him to expand, to continue. That is correct. And that's what I was asking you. The district court thinks so, and that's what I'm saying. Your position is that the issue in the case is if a man has gang symbols on and he's been in prison, that gives you particularized suspicion. Yes. That's what the district court found. Right. I know, and that's how we're here today. Yes. That is the position. Yes, Your Honor. Okay. Yes. And if we decided that was not, those facts did not give rise to particularized suspicion, you would lose? I believe so, yes. Okay. All right. Sometimes it's harder to figure out exactly what the issue is. Yes, and that's the whole series of questions, some of which are clearly proper, some of which may not have occurred, but we assume they did, and some of which may or may not be improper. I mean, I just, speaking for myself, I happen to think that saying where are you from is a proper question. Well, and especially in this case, Your Honor, in the context of the entire stop. No, no. I don't have a problem with that question. And it is our position that once they ask the question where are you from and receive the answer, the two answers, I'm from the Latin Kings and I've spent time in prison and in Illinois, that that gave them additional reasonable suspicion to follow up on that line of questioning apart from the registration violation. Okay. And this is similar to Perez where the officers made the stop for, I believe it was weaving over the line, and eventually made an arrest for drugs. What are the additional factors there? The additional factors in Perez were that the defendant appeared very nervous was he would not make eye contact with the officers. He was sweating profusely. He was not the registered owner of the vehicle. He was heading to a city known as a drug hub, Salt Lake City. And he had well-manicured hands when he had told the officers he was actually a mechanic. Those were the suspicious factors there. Okay. It sounds like one of those stops near the border. I don't know if it was on the border, but it was a stop. He was either going too fast or too slow. Yes. And one additional fact that I'd like to bring up because, again, I believe Appellant's position is the officers did not have any reason to detain him after the officer who ran the license came back from the car because they were no longer investigating the reason for the stop, the registration violation. They did issue a citation here. Appellant says in his briefs that there was no citation issued. There was a citation issued for no registration and for no insurance. Well, sure, after they booked him and got him, you know, I mean, probably four hours later. Right. But he states in his briefs they never even cited him. Probably didn't appear on the citation because he was in jail on this charge, and there's probably a bench warrant out for his arrest for failure to appear on it. That may be. I don't know. But the fact is. That makes them three strikes. Three strikes. All right. Thank you very much, counsel. Thank you. We're ready for rebuttal. I only wish to add at this point that the Chavez-Valenzuela case made it pretty clear that there is a point in time where officers really have to stop searching because if they've satisfied the purpose for their stop, then really there's no longer a prolonged, a reason for prolonged detention. But here they hadn't even finished writing the ticket yet, had they? Well. They clearly could have detained him for an additional however long it takes to write a ticket. It appears that these officers acted from the very beginning as if they had probable cause because they already. The Supreme Court has told us in Wren and Delaware v. Prowse and all those cases that we can't look at the subjective intent of the officers. The question is objectively, you know, are they entitled to continue the detention? And here they clearly could have kept him long enough to write out a ticket. And I agree. And that's why the Wren case was also cited. But when you have an officer saying, yeah, I ran the registration check and it was before the appellant was arrested, and then you show their own police reports that that's not true, that it was a good half hour after he was arrested, then I think there's an issue there that the district court should have addressed. You know, I'm sorry I didn't ask the question. He said that the officer three times said he did run the check on registration right away, and the computer says he didn't do it for 28 minutes. Did the district court deal with that? In the order, no. There was no reference to any of the discrepancy of the controverting facts. The opponent seemed to think that that was the officer's version was correct rather than the computer, or that the computer doesn't say that. I'm not sure which, because I forgot to ask the question. But there is a – it may not matter, but it would be nice to know whether the officer was just made a statement that was not correct or whether there was – the computer was perhaps not correct. Well, in cross-examination, he was specifically asked that. I believe it's page 65 and 66 of the excerpt of record. And he indicated that that's what he had done. And that was reflected in their written police report, and we now know that that's just not the case.  Well, okay. But we do have the computer history, and it is part of the court file. Computers maybe lie just the way officers could. Maybe computers – I'm just curious, and this probably has no relevance at all, but just for my own information, is it pretty customary in this part of Arizona for the officers when they make a traffic stop like this for a failure to have a timely – for expired registration to do a pat-down to ask the person to get out and do a pat-down search? Is that – Well, as defense counsel said – Is that standard practice there? It appears that the neighborhood or the kind of neighborhood was taken into account as well as the fact that the client was Hispanic, and defense counsel made a point of bringing that out to the court. These were gang officers, right? They were. Yes, they are. They probably make pat-downs. Unless the court has any further questions, I would submit. Thank you. Thank you, counsel. Thank you, Judge. The case just argued will be submitted.
judges: Reinhardt, Paez, Tallman